# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
### June 9, 2020 Session

## STATE OF TENNESSEE v. WILLIE NATHAN JONES

**Appeal from the Criminal Court for Putnam County**
**No. 2015-CR-1073  Gary McKenzie, Judge**

————————————————————

## No. M2019-01273-CCA-R3-CD

————————————————————

In February 2016, the Putnam County Grand Jury indicted Defendant, Willie Nathan Jones, for first degree premeditated murder and first degree felony murder in the death of Rodney Richards and for attempted first degree murder of Stacy Maynard. Following a trial in April 2018, a jury found Defendant guilty of the lesser-included offenses of second degree murder and attempted second degree murder, for which Defendant received an effective sentence of thirty-seven years' incarceration. On appeal, Defendant contends that: (1) the evidence was insufficient to support his convictions; (2) the trial court erred by repeatedly referring to Mr. Richards and Ms. Maynard as "victims" throughout trial; (3) the trial court violated Defendant's due process rights by preventing him from properly impeaching a State's witness using the sheriff department's "Use of Force" and "Critical Incident" guidelines; (4) the State violated Defendant's right to a fair trial by "continuously commenting on the evidence and credibility during closing arguments"; (5) the trial court erred by failing to suppress Defendant's statements to police because he was questioned while tired and under the influence and because Defendant's request for counsel was not honored; (6) the trial court abused its discretion in ordering consecutive sentencing; and (7) cumulative error necessitates a new trial. Following a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Evan M. Wright (on appeal), Jamestown, Tennessee, and Gordon A. Byars (at trial), Cookeville, Tennessee, for the appellant, Willie Nathan Jones.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Bret Gunn and Beth Willis, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

*Motion to Suppress*

Prior to trial, Defendant filed a motion to suppress his statements to police, arguing that there was no probable cause for Defendant's warrantless arrest and that Defendant was too intoxicated or high to knowingly waive his *Miranda* rights. At a hearing on the motion, Major Terry Hembree of the Putnam County Sheriff's Department testified that he was involved in the investigation into the murder of Mr. Richards and the attempted murder of Ms. Maynard. Major Hembree explained that, at 4:54 a.m. on October 7, 2015, the sheriff's department received a 9-1-1 call regarding a shooting at a residence on White Oak Flat Road. Major Hembree recalled that, when deputies arrived, they spoke to Ms. Maynard, who had suffered gunshot wounds to the face and leg. Despite her severe injuries, Ms. Maynard "made statements about what had happened and how she was injured" and told deputies that "there was another person who [had been] shot" at the residence next door. Ms. Maynard identified the assailant who shot her and Mr. Richards as a man she knew as "Jonesy."

Major Hembree testified that one of the deputies was familiar with an individual known as "Jonesy" and that, after checking the inmate booking record, they were able to determine Defendant used the nickname "Jonesy." Major Hembree recalled that Ms. Maynard said that Defendant took her vehicle from the residence where the shooting occurred and that she drove Defendant's car to the neighbor's house. Major Hembree stated that deputies discovered that the car, driven by Ms. Maynard away from the scene of the shooting, was registered to Vicki Jones, Defendant's mother. They found that Ms. Maynard's vehicle was missing, and based on Ms. Maynard's statements, they believed that Defendant was in possession of her vehicle.

Major Hembree testified that deputies spoke with Defendant's parents. Defendant's mother had seen television news reports about Mr. Richards' murder and learned that Defendant was a suspect. Major Hembree said that deputies then made contact with Defendant. Defendant told deputies that he left Ms. Maynard's car at Cane Hollow, a recreational area in White County, and he gave deputies "an indication of

- 2 -

where the car was located at that area." Major Hembree testified that deputies later found Ms. Maynard's car where Defendant had indicated.

Major Hembree stated that he met with Defendant around 12:10 p.m. on October 7. Major Hembree read Defendant his *Miranda* rights and inquired whether Defendant had ingested any drugs or intoxicants within the last twelve hours. Defendant told Major Hembree that he had "tasted of some meth when [Defendant] was at the residence where the shooting occurred, uh, or smoked a little bit . . . [a]nd then that he had taken some Percocet." Major Hembree testified that Defendant was responsive to his questions and that Defendant could "articulate his answers to the questions very, very well." Major Hembree denied that Defendant was "in any kind of a stupor" during questioning. When asked about his general impressions of Defendant's ability to comprehend their conversation, Major Hembree stated, "I thought it was very good. I mean, there were times that he would correct me if I said something that was wrong."

On cross-examination, Major Hembree stated that he received calls from both dispatch and the on-call detective, Greg Pauch, regarding the shooting. Major Hembree arrived at the residence from which the 9-1-1 call was made sometime before 6:30 a.m.; however, Ms. Maynard had been transported to the hospital already. Major Hembree recalled:

> Well, Detective Pauch was the first person I made contact with. He briefed me on the information that he had received up to that point. He told me there was one deceased person in the mobile home at the bottom of the hill where we were located. And that [Ms. Maynard] had gone to the residence just a little ways up the road . . . to get help.

> . . . .

> Deputy [Matthew] McDaniel was the person who was familiar with [Defendant]. He was the one who was going to try to make the contact. I did have a conversation with [Deputy McDaniel]. He told me he knew where [Defendant] lived and that he was familiar with [Defendant].

Major Hembree said that Deputy McDaniel had attended high school with Defendant and that Deputy McDaniel spoke to Defendant's friend to negotiate Defendant's surrender. Major Hembree recalled that Defendant turned himself in to authorities around 10:24 a.m. Major Hembree stated that he obtained an arrest warrant at 6:30 p.m. that evening.

- 3 -

The following exchange then occurred regarding Major Hembree's interview with Defendant:

[DEFENSE COUNSEL]: [Y]ou're asking [Defendant] about drug usage the night before?

[MAJOR HEMBREE]: Yes.

[DEFENSE COUNSEL]: And he indicates that he had done a little pile of meth?

[MAJOR HEMBREE]: Yes.

[DEFENSE COUNSEL]: And that would have been, at a minimum, about five or six hours previous to when you were speaking with him?

[MAJOR HEMBREE]: Well, I couldn't say for certain, because the time frame that [Defendant] gave me initially was somewhere in the neighborhood of 12:30 to 1:00, was when he did this. But at -- at one point [he] had left that residence, where this shooting had taken place, and then came back, so.

. . . .

[DEFENSE COUNSEL]: And he told you that he had snorted how many Percocet?

[MAJOR HEMBREE]: Five.

Major Hembree said that he did not notice Defendant sweating or shaking during the interview. He did not notice any pupil dilation or "abnormal pupil constriction[.]" Major Hembree testified that Defendant did not have any questions about the *Miranda* warning. The following colloquy then occurred:

[DEFENSE COUNSEL]: Did he at any point during the execution of *Miranda* ask you to speak with an attorney?

[MAJOR HEMBREE]: He mentioned an attorney, not during the reading of the *Miranda*, but during the course of the interview.

. . . .

- 4 -

[MAJOR HEMBREE]: I specifically recall him mentioning an attorney when we were talking about obtaining gunshot residue from -- or testing his hands for gunshot residue.

. . . .

[MAJOR HEMBREE]: [Defendant] said, "It don't bother me, but I'd like to have a -- a lawyer, you know. I'm -- I'm scared."

Major Hembree testified that he explained to Defendant how a gunshot residue test was conducted, and then, they took a break from the interview. Major Hembree said that, when they returned from the break, he did not provide Defendant with a *Miranda* warning a second time. Major Hembree explained:

I did ask [Defendant] if he was still willing to talk to me. I referenced the fact that he had mentioned an attorney, or a lawyer, and I said, "I read you your rights, you know, you understand what your rights are?" He said, "Yeah, I understand what they are." . . . . And I said, "Do you still want to talk to me?" [Defendant] said, "Man, I'm telling you anything you need to know, that I remember. You know, I'm trying to forget it too."

At the conclusion of the hearing, the trial court denied Defendant's motion to suppress. The trial court found that there was probable cause to arrest Defendant based on Ms. Maynard's statements to police and evidence corroborating her statements. The trial court found that Defendant was "properly *Mirandized*" and that he knowingly waived his rights and spoke to Major Hembree. The trial court accredited Major Hembree's testimony that Defendant was responsive to questioning, that his answers were coherent and appropriate, that Defendant corrected Major Hembree when he made an inaccurate statement, and that Major Hembree did not witness any clues of Defendant's being under the influence of an intoxicant.

*Motions in Limine*

Prior to trial, Defendant filed several motions in limine. In "Defense Motion in Limine #5 Motion to Prohibit Reference to Complaining Witness or the Deceased as 'Victim,'" Defendant requested that the trial court instruct "the District Attorney General, his staff and/or any State witness" not to refer to Ms. Maynard or Mr. Richards as "victim." He argued that, by referring to the complaining witness as "victim," both the prosecutor and the trial court would "appear to be vouching for the credibility of the version of events set forth by [the] State because 'victim' necessarily implies that a crime

- 5 -

was in fact committed against the complaining witness." He argued that "such statements or testimony would be prejudicial to the rights of [Defendant] . . . and a violation of the Constitution and the Laws of the State of Tennessee." He asked that the trial court enter an order precluding the use of the term "victim" and instead requiring "all counsel and relevant persons to use the complaining witness['] proper name, or any of the following terms: 'Complaining Witness' or 'Alleged Victim.'"

In ruling on Defense Motion in Limine #5, the trial court stated:

> And I would, I agree with the defense, in that -- in that my jury instructions, of course, when I refer to the victim will be "alleged victim," and that is, I understand that to be the law. And I will, I'm going to ask the district attorney's office to refer to "alleged victim." But I will say this. We try these things, and people get going, and then we, you know, we get -- it's going to be an excitable case, I'm certain of that, with the nature of the case, and so it could be that someone makes a reference to "victim." It could be that the defense does, I mean, as we just do what we do. And so I anticipate giving a limiting instruction at any point that that is breached, I will explain to the jury that they are the ones to decide whether there's a victim or not, and they should consider it, "alleged victim," regardless of however somebody refers to it in the courtroom.

Additionally, Defendant filed a "Motion in Limine Concerning the State's Argument," seeking an order prohibiting the State from engaging in improper prosecutorial argument or conduct. In ruling on the motion, the trial court noted that the State agreed to not engage in improper argument or conduct and stated, "And, obviously, . . . anybody that runs afoul of it, you certainly can object to it. And your objection is noted for all of these by that motion."

*Trial*

State's Proof

At trial, Stacy Maynard testified that she dated Rodney Richards for about three years before his death on October 7, 2015. Ms. Maynard explained that she was at Mr. Richards' residence the morning he was shot and killed by Defendant. She said that she did not know why Defendant killed Mr. Richards and stated that Defendant also attacked and attempted to kill her. Ms. Maynard testified that Defendant shot her twice—once in her right knee and once in her left upper lip. She explained that the bullet that went through her lip also went through the palate of her mouth and lodged in her mandible. She said that doctors later removed the bullet during surgery. Ms. Maynard stated that

Defendant also repeatedly stabbed her in the back and face and hit her with a gun "[a]ll over." She stated that the assault occurred at Mr. Richards' residence on White Oak Flat Road in a remote, rural area of Putnam County.

Ms. Maynard testified that, prior to October 7, 2015, she would spend the night with Mr. Richards two to three times a week. She stated that Mr. Richards had worked with Defendant for several years at a place called ARC, and more recently, they had worked together at NuEra and Triple-W in Cookeville. Ms. Maynard recalled that she had seen Defendant at Mr. Richards' residence two times prior to October 7 and had never noticed any difficulties between Mr. Richards and Defendant. Ms. Maynard acknowledged that she, Mr. Richards, and Defendant had used methamphetamine together at Mr. Richards' residence. She stated that she began using methamphetamine when she was fourteen or fifteen and that her drug usage eventually caused her to be on probation. She said that she and Mr. Richards sold methamphetamine to four or five close friends to support their drug habits. She denied selling large quantities of methamphetamine and explained that their sales were for a quarter of a gram, which was worth twenty-five dollars.

Ms. Maynard recalled that Mr. Richards worked at Triple-W on the evening of October 6, 2015. She stated that, although Mr. Richards owned a truck, he did not drive the truck to work that night because it had a flat tire. Ms. Maynard explained that she took Mr. Richards to work in her 2007 Chevy Impala and picked up Mr. Richards from Triple-W after work around 8:00 or 9:00 p.m. She stated that she and Mr. Richards went to Walmart afterwards and then returned to Mr. Richards' residence. Ms. Maynard recalled that, as they were leaving Triple-W, Mr. Richards spoke to Defendant on the phone, and they arranged for Defendant to come to Mr. Richards' residence to help Mr. Richards change the tire on his truck.

Ms. Maynard testified that, earlier in the day, she was with friends, Jessica Austin and McKenzie Pritchard, and that they used methamphetamine. She explained that Ms. Austin brought her some clothes to go through before Ms. Austin took them to Goodwill. Ms. Austin also gave Ms. Maynard a DVD player and said that she would bring Ms. Maynard additional clothes later that night. Ms. Maynard explained that, once she and Mr. Richards arrived home, Defendant came over, followed by Ms. Austin, Mr. Pritchard, and David Whitaker. She said that David Whitaker was often at Mr. Richards' residence because he was Mr. Richards' best friend. Ms. Maynard testified that she went through the clothes that Ms. Austin brought to the residence, and they put on a movie. She stated that she did not use methamphetamine that night and did not see anyone else using drugs. She recalled that Mr. Richards and Defendant were outside changing the tire on Mr. Richards' truck. Ms. Maynard testified that she took a bath after her friends left. She stated that she heard no disturbance between Defendant and Mr. Richards while she

was in the bath. She recalled that Defendant was the last to leave the residence and that he left soon after she got out of the bath. She estimated that Defendant left the residence sometime between 1:00 and 2:00 a.m.

Ms. Maynard testified that she and Mr. Richards then went to bed. She testified that, at one point, Mr. Richards got up to use the bathroom. She recalled that, while Mr. Richards was in the bathroom, she heard a vehicle on the gravel driveway, and she told Mr. Richards that someone was outside. Ms. Maynard testified:

> [Mr. Richards] went down the hallway, and . . . opened the door to see who it was. Um, and he quickly came to the bedroom, and he seemed kindly aggravated, but . . . he wasn't mad. But, you know, [Mr. Richards] said, "It's Jones," you know, and . . . he turned and went back down the hallway just pretty quickly after that.

Ms. Maynard recalled that, when she walked into the living room, Mr. Richards "turned to the left, where the couch was at . . . I guess perhaps to sit down" and that Defendant was standing at the front door, which opened into the living room. Ms. Maynard recalled that she continued to the kitchen to get a drink and that, as she passed Defendant, she said "in a joking manner," "What in the hell are you doing back?" She said that it was unusual for Defendant to show up unannounced but stated that Defendant and Mr. Richards did not argue. Ms. Maynard testified that, as she was getting some water in the kitchen, she heard a "loud noise" that sounded like a bomb. She said that she immediately turned towards Mr. Richards and that he "looked okay at first[.]" Ms. Maynard then looked at Defendant and saw that Defendant had a gun. She looked back at Mr. Richards and saw "some blood coming down from behind his ear." Mr. Richards grabbed his chest and said, "Why, Jonesy, why?"

Ms. Maynard said that she panicked and got between the wall and the refrigerator, opened the refrigerator door, and attempted to use the door for protection. Ms. Maynard recalled that, when Defendant came towards her, she tried to hit him with the refrigerator door but was unsuccessful. She said that Defendant stood in front of her pointing the gun in her face. She attempted to reason with Defendant, but he did not respond in any way. She testified, "I walked into [Defendant] to try to maybe get the gun away from my face . . . and as I was walking into him, he was walking backwards. But, you know, I'm still begging. And [Defendant] squeezed the trigger." Ms. Maynard explained that Defendant shot her in the face. She stated:

> I'm still standing there, you know, with my eyes open, and I'm still on my feet, and, so, you know . . . I'm questioning at whether or not I'm shot. But I start to speak to [Defendant] again, to beg for my -- for my life.

And as I start to speak to him, there's . . . liquid in my throat, and . . . as I'm trying to talk, I, I feel warmth in my chest. And I was wearing a white thermal shirt, and when I looked down, there was a there was a red spot on my shirt, and it was just growing.

Ms. Maynard said that she struggled with Defendant for the gun, and he shot her in the knee. As she continued to struggle for the gun, Ms. Maynard recalled that Mr. Richards often left his keys in the ignition of his truck, so she ran out the front door towards the truck. Ms. Maynard explained that she got into the driver's side of the truck and found that the keys were in the ignition; however, Defendant jumped into the passenger side of the truck before she could lock the doors. She stated that she again struggled with Defendant but that she was able to start the truck and put it in drive. However, her car was in front of the truck, and she drove the truck into her car. Defendant then began hitting her in the face with the gun, knocking out some of her teeth. Ms. Maynard recalled that, as Defendant put the truck in park and took the keys from the ignition, he put the gun in his lap. Ms. Maynard grabbed the gun and began hitting Defendant in the face with it. Ms. Maynard said that she got out of the truck, pointed the gun at Defendant, and pulled the trigger, but "it didn't fire."

Ms. Maynard recalled that she started down the driveway, and Defendant followed her. She stated that her knee "[gave] out on [her]," and she fell to the ground. Ms. Maynard said that Defendant grabbed her by her hair, pulled her towards the truck, and began stabbing her in the back. The following colloquy then occurred:

[THE STATE]: Okay. And do you see what [Defendant's] . . . stabbing you with?

[MS. MAYNARD]: No.

[THE STATE]: Okay. You feel it?

[MS. MAYNARD]: I feel it.

[THE STATE]: And how long does that go on?

[MS. MAYNARD]: Quite a while. [Defendant] had even used the instrument to, uh, run along -- along my neck, back and forth in a sawing motion. Um, he also actually stuck it in my mouth, like, like almost trying to pierce my cheek.

- 9 -

Ms. Maynard stated that she "play[ed] dead" by slowing her breathing and lying still on the ground. Defendant then went back inside Mr. Richards' residence. Ms. Maynard testified that she found that Defendant left the keys to his car in the ignition. She explained that the keys to her car were inside Mr. Richards' residence in her purse, along with her driver's license and cash. She stated that the purse and keys were eventually returned to her but that the driver's license and cash were gone.

Ms. Maynard said that she drove Defendant's car to the nearest neighbor's residence and that she still had the gun with her at that time. When she arrived, she screamed for help, and the neighbor, Lynn Burton, allowed her inside his residence. Ms. Maynard testified that, as Mr. Burton's wife called 9-1-1, Ms. Maynard saw Defendant drive by Mr. Burton's residence in her car. Ms. Maynard said that she called her mother prior to the arrival of medical personnel because she thought she was going to die.

Ms. Maynard said that she was in the hospital for four days after Defendant's attack. She said that she lost teeth due to the incident. She explained:

> [T]hey were unable to remove the bullet from my tibia. It went behind my kneecap and lodged into my tibia, and they were afraid to remove it because it could cause further damage to my tibia, so they left the bullet in, in my tibia. I now have a lot of psychological problems. But, as far as physical, you know, my, my mandible was destroyed.

On cross-examination, Ms. Maynard acknowledged that, at the time of the offense, she was on probation for six years for manufacturing methamphetamine. She agreed that she had failed a drug screen prior to October 7 and that she had been worried about having to serve her six-year sentence. She further agreed that she told Mr. Richards she needed money to hire an attorney. She denied that she had "money struggles" but agreed that Mr. Richards did not make a lot of money. Ms. Maynard agreed that she was interviewed by a detective several times after the assault. She stated that, as far as she knew, Defendant had no reason to kill Mr. Richards. She denied ever going to Defendant's home. She acknowledged that police found drug paraphernalia in Mr. Richards' residence, that she was not charged with possessing the paraphernalia, and that her probation was not violated based on what police found. She stated that she had since completed probation.

Investigator Joanne Clouse with the Putnam County Sheriff's Department testified that she responded to Mr. Burton's residence around 5:15 a.m. on October 7, 2015, after dispatch received a call about a shooting. Investigator Clouse explained that she and a deputy rendered aid to Ms. Maynard, whom they found lying in the kitchen floor bleeding. Investigator Clouse recalled, "[Ms. Maynard] was lying on her left side. She

had towels in her mouth, and she had blood on the towels. And she had a towel wrapped around her right knee." As she helped apply towels and pressure to Ms. Maynard's wounds, Investigator Clouse asked Ms. Maynard her name, date of birth, and address, which Ms. Maynard was able to provide. Ms. Maynard explained that she had come from her boyfriend's residence and that she had been shot by a man she knew as "Jonesy." Investigator Clouse radioed dispatch and said, "All we have is the nickname of Jonesy. See if you can find something." She recalled that one of the dispatchers checked aliases in the sheriff department's reporting system and came across a booking record for Defendant that said, "Also known as Jonesy." Investigator Clouse said that there was a white Honda Accord parked outside of the residence and that, when dispatch ran the registration on the vehicle, Investigator Clouse learned that it was registered to Defendant's mother.

On cross-examination, Investigator Clouse stated that, after she had been at Mr. Burton's residence about an hour, Mr. Burton located a gun wrapped in towels. Investigator Clouse said that, based on her discussion with Mr. Burton, he was unaware that the gun was there until after Ms. Maynard was transported from the residence by EMS.

Deputy Patrick Short with the Putnam County Sheriff's Department testified that he, along with several other deputies, responded to Mr. Richards' residence on the morning of October 7. Deputy Short stated that he observed "a little S-10 truck" outside the residence that contained blood in several areas. He said that he and Deputy Matt Scott entered the residence and found Mr. Richards "slumped over the couch covered in blood." After clearing the residence, Deputy Short checked Mr. Richards for a pulse but found that he did not have one. The deputies then exited the residence to wait for a detective to respond to the scene.

Tommy Lynn Farr testified that he lived on White Oak Flat Road and that, around 10:00 or 11:00 a.m. on October 7, 2015, he was mowing the grass for a neighbor, Wayne Martin. Mr. Farr recalled that his lawn mower stopped working and that, as he walked back towards his residence for some tools for the mower, he saw a driver's license in the road in front of the mailbox. Mr. Farr testified that he had heard about the shootings earlier that morning but did not think that the driver's license was connected. He stated that, several minutes after showing the driver's license to Mr. Martin, a detective arrived to collect it. Mr. Farr showed the detective where he found the driver's license so that the detective could photograph the area. Mr. Farr recalled that, while in the area, the detective found a rubber glove lying in the middle of the road about thirty to forty feet from where he discovered the driver's license.

Deputy Matthew McDaniel testified that he responded to Mr. Richards' residence on the morning of October 7. Deputy McDaniel stated that, when he learned that Defendant was a suspect in the shooting, he requested permission to go to the residence Defendant shared with his parents to watch for Defendant to return home. Deputy McDaniel explained that he had gone to high school with Defendant and that they had played recreational sports together. He recalled that he watched the residence for about an hour and saw Defendant's mother, Vicki Jones, outside. Deputy McDaniel spoke to Mrs. Jones, and she allowed him to search the residence to ensure that Defendant was not inside. Deputy McDaniel testified that Mrs. Jones believed Defendant was in contact with Jeff Allen, so he asked Mrs. Jones to call Mr. Allen. Through Mr. Allen, Deputy McDaniel asked Defendant to turn himself in. Deputy McDaniel stated that, a couple hours later, Mr. Allen brought Defendant home, and Defendant surrendered. At that time, Deputy McDaniel noticed that Defendant's clothing was "wet" and "soggy to the touch," so he allowed Defendant to get some dry clothes to take with him to the sheriff's department. Deputy McDaniel explained that he transported Defendant in the back of his patrol car and that Defendant was cooperative and eager to talk to detectives. Deputy McDaniel recalled that Defendant did not have a cell phone with him at the time he was taken into custody. He stated that he collected Defendant's wet clothing at the sheriff's department and allowed Defendant to change into the dry clothes. He then escorted Defendant to an interview room.

Jessica Austin testified that she met Ms. Maynard through Ms. Austin's nephew and that she and Ms. Maynard became friends. Ms. Austin stated that she and Ms. Maynard used drugs together and that she would sometimes buy small quantities of methamphetamine from Ms. Maynard. She denied ever seeing Ms. Maynard or Mr. Richards selling large quantities of methamphetamine. She said that, over a few months, she went to Mr. Richards' residence about ten times and that she typically "got high" while there.

Ms. Austin recalled that, on October 6, 2015, she gave Ms. Maynard a DVD player, and Ms. Maynard went through some clothes that Ms. Austin was intending to give away. Ms. Austin explained that Ms. Maynard invited her to Mr. Richards' residence later that night. Ms. Austin stated that she and her friend, Mr. Pritchard, arrived at the residence around 12:30 a.m. on October 7. She recalled that, when they arrived, Defendant, David Whitaker, and David Whitaker's girlfriend were there. She said that Defendant was outside with Mr. Richards "working on a tire." Ms. Austin stated that she brought Ms. Maynard "a couple of shirts" and that she watched a movie and used some drugs. She said that she was uncertain if Ms. Maynard used drugs that night. Ms. Austin estimated that she and Mr. Pritchard were at the residence for forty-five minutes, leaving around 1:15 a.m. She testified that, while she was at Mr. Richards' residence, there were no arguments or displays of anger between the individuals at the

residence. She said that David Whitaker and his girlfriend left the residence before she and Mr. Pritchard.

Ms. Austin testified that she learned about the shooting around 8:00 a.m. on October 7 and that she spoke to police later that day. She stated that, when she last saw Mr. Richards, he was wearing a baseball cap, a button-up long-sleeved shirt, and jeans. She agreed that she had seen a photograph of Mr. Richards taken by police after the shooting and that Mr. Richards did not have on the same clothing. Ms. Austin agreed that, when she spoke to the detective, she lied about her drug use; she explained that she was on probation at the time and did not want her probation to be revoked. Ms. Austin testified, however, that her probation was eventually revoked and that she attended a twelve-month program for her drug addiction. She stated that she had been "clean" for two years by the time of Defendant's trial.

On cross-examination, Ms. Austin agreed that she saw Ms. Maynard several days after Ms. Maynard was discharged from the hospital. She said that Ms. Maynard told her that, when Mr. Richards opened the door for Defendant, Defendant shot Mr. Richards, and Mr. Richards fell onto the couch.

David Whitaker testified that, in October 2015, Mr. Richards was his best friend. He explained that he lived on White Oak Flat Road about two miles away from Mr. Richards. David Whitaker stated that he was at Mr. Richards' residence in the early morning on October 7, 2015. He stated that Defendant and Ms. Maynard were there when he arrived and that Defendant and Mr. Richards were changing a tire on Mr. Richards' truck. David Whitaker testified that he used some methamphetamine while at the residence. He said that he arrived at the residence shortly after midnight and left about an hour and a half to two hours later. He stated that there was no confrontation, anger, or dispute between Mr. Richards and Defendant while he was there. David Whitaker learned about the shooting while he was at work on October 7 and testified that he spoke to a detective about the case that evening.

Gregory Pauch testified that he worked as a detective with the Putnam County Sheriff's Department on October 7, 2015, and that he was the lead investigator on Defendant's case. Detective Pauch recalled that he responded to Mr. Richards' residence about 5:00 a.m. He stated that other deputies had entered and cleared the residence prior to his arrival. Detective Pauch stated that he "proceeded with external photos and video of the scene[.]" Detective Pauch testified:

> [O]utside the exterior of the home, on the walkway and onto the
> deck, there were . . . what appeared to be droplets of blood. I -- and also

- 13 -

there was a vehicle . . . just to the outside of the home, a pickup truck that
had, uh, what seemed to be blood inside and outside of it as well.

Detective Pauch said that he collected swabs of the blood stains on the steering wheel of the truck. He also recovered a tooth fragment in the driver's side floorboard. He said that the keys to the truck were found on the ground outside the truck. Detective Pauch stated that he found a live round of ammunition in the driveway by the truck.

Detective Pauch testified that, when he entered the residence, he observed Mr. Richards on the couch and the water running in the kitchen sink at "full capacity." He said that there was "an extreme amount of blood collecting, pooling and splatter on the floor" next to Mr. Richards. He saw blood droplets on the floor at the threshold of the front door and blood on the door. He found a spent .380 caliber shell casing and a tooth fragment in the living room floor near the front door. Detective Pauch recalled that he recovered a second spent .380 caliber shell casing on the kitchen floor. In the kitchen trash can, he found a yellow rubber glove with blood on it. Detective Pauch testified that, in a bedroom, he found an overturned purse on the bed.

Detective Pauch testified that Mr. Richards' body was taken to the medical examiner's office in Nashville. After the autopsy, Detective Pauch collected fingernail clippings from Mr. Richards, his clothing, a blood sample, and a spent bullet retrieved from Mr. Richards' "right chest cavity." He stated that these items were later sent to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing.

Detective Pauch testified that he interviewed Ms. Maynard three times. He recalled that he first visited Ms. Maynard at the hospital; he said that she was "extremely groggy" due to medication but that she knew who he was and what he wanted to talk to her about. He interviewed Ms. Maynard for the second time at her mother's home a few days after Ms. Maynard was discharged from the hospital. He testified that she was "more lucid" and able to provide additional detail about the shooting. Finally, Detective Pauch interviewed Ms. Maynard on October 21, 2015, at the sheriff's department. He recalled that she was no longer on medication and that she was able to communicate more completely. He said that he obtained a buccal swab from Ms. Maynard for the purpose of DNA blood comparisons.

On cross-examination, Detective Pauch stated that, when he entered Mr. Richards' residence, both the front door and a sliding glass door in the kitchen were open. He agreed that Mr. Richards' residence was turned over to the property owner, Bobby Whitaker, on October 8. Detective Pauch stated that there was blood found on the yellow rubber glove in the trash can. He said that he looked through the trash and searched the residence but found no other matching gloves. He agreed that he did not locate a third

shell casing in his search of the residence and that Bobby Whitaker recovered the shell casing a week after the search. Detective Pauch identified a photograph of a wall in Mr. Richards' residence that contained "very small holes." He did not recall checking the holes to determine if they were bullet holes. He agreed that deputies did not recover the weapon used to stab Ms. Maynard. He further agreed that the witnesses he interviewed denied any drug usage at Mr. Richards' residence, despite his finding several methamphetamine pipes in a bedroom.

Detective Pauch agreed that he conducted the investigation with the understanding that Ms. Maynard and Mr. Richards were victims and that Defendant was the suspect. He explained that this was based on Ms. Maynard's description of what occurred at Mr. Richards' residence, her corroborating injuries, and the evidence he collected at the crime scene. He acknowledged, however, that Ms. Maynard was in possession of the gun at the time deputies responded to the 9-1-1 call. Detective Pauch agreed that he found no motive for Defendant's attack on Mr. Richards and Ms. Maynard.

Dr. Emily Dennison, an assistant medical examiner with the Davidson County Medical Examiner's Office, testified that she conducted the autopsy on Mr. Richards and determined that his cause of death was a gunshot wound to the face. Dr. Dennison explained that the bullet entered on the left side of Mr. Richards' face, on the cheek, and that the trajectory was a "sharp downward angle" towards the right chest. She testified that the bullet moved from "the left side of the face . . . downward into the structures of the left side of the neck[,]" through the carotid artery and muscle in the neck. The bullet crossed the midline of the neck and entered the top part of the right chest cavity. Dr. Dennison stated that she determined the gun was at least two feet away from Mr. Richards at the time of the shooting based on the lack of stippling around the gunshot wound. Dr. Dennison stated that she did not believe Mr. Richards "was moving around at all" when he was shot.

Dr. Dennison testified that she believed Mr. Richards was sitting at the time he was shot. She noted that Mr. Richards was found slumped on the couch with one foot "kind of tucked underneath his body[.]" She explained that there were droplets of blood on the bottom of that foot and that "it looked more like he was positioned that way already, and it just fell on the bottom of his foot." Dr. Dennison stated, "You would expect it to be smeared around if he was moving. So, it looks like he just was shot and slumped over." Dr. Dennison testified that the toxicology report showed that Mr. Richards had methamphetamine in his system at the time of his death. She collected fingernail clippings, a blood sample, and the bullet from Mr. Richards' body. Dr. Dennison agreed that Mr. Richards could have spoken a few words after being shot but before losing consciousness.

Bobby Whitaker testified that he lived on White Oak Flat Road and that his wife, Kathy Jane Whitaker, was Mr. Richards' mother. He stated that he owned the property where Mr. Richards was living on October 7, 2015. He recalled that, about a day after the shooting, he and Mr. Richards' brother went to the residence to clean it. He stated that, when he picked up a blanket from the couch, a shell casing fell out onto the couch. He said that he gave the shell casing to a detective.

Detective Roger Cooper of the Putnam County Sheriff's Department testified that he responded to the call from Mr. Farr regarding Ms. Maynard's driver's license. Detective Cooper explained that he took possession of the driver's license and asked Mr. Farr to show him where in the road he found the item. Detective Cooper recalled that, as he was looking around in the area where the driver's license was located, he noticed a yellow glove lying in the roadway. He said that the glove "had a reddish-brown stain on it . . . which, through training and experience . . . looked like it could be blood." He stated that he was aware that a yellow rubber glove had been found at the crime scene, so he photographed the glove in the roadway and collected it as evidence. Detective Cooper recalled that he also collected an unused bandage from the roadway due to its proximity to the other items of evidence.

Detective Cooper stated that he spoke to Mr. Allen after Mr. Allen facilitated Defendant's surrender. Detective Cooper said that he took photographs of the call log on Mr. Allen's phone to document the communications between Mr. Allen and Defendant. He said that he found phone calls from the morning of October 7 between Mr. Allen's phone and a contact named "Jonesy." He explained that the series of calls took place between 7:39 and 10:01 a.m. Detective Cooper stated that he collected the shell casing found by Bobby Whitaker. He explained that detectives "definitely looked" in the area where the shell casing was found but that Bobby Whitaker said he found it after shaking out the blanket on the couch.

Detective Shane Higgenbotham testified that he worked on the investigation into Mr. Richards' death in October 2015. Detective Higgenbotham stated that, by the time he responded to Mr. Burton's residence, Ms. Maynard had been airlifted to the hospital. Detective Higgenbotham found a white Honda Accord at Mr. Burton's residence with reddish-brown stains on it that appeared to be blood. He stated that the white Honda Accord was later transported to the TBI crime lab for processing. Inside Mr. Burton's residence, he collected a gun wrapped in bloody towels; he also collected a swab of blood from the gun as evidence. Detective Higgenbotham recalled that he went to a location in Cane Hollow in White County later in the day because deputies had located Ms. Maynard's vehicle there. He explained that Cane Hollow was "a remote area of Center Hill Lake [where] you could launch boats or hang out." He said that deputies had located the vehicle "in a very thick wooded area . . . maybe a quarter to a half a mile back in the

- 16 -

woods." Detective Higgenbotham testified that he photographed the vehicle, noting what appeared to be blood stains.

Major Hembree testified consistently with his testimony at the motion to suppress hearing. He explained that he interviewed Defendant on October 7. The audio-recorded interview was played for the jury as an exhibit to Major Hembree's testimony.

During the interview, Defendant told Major Hembree that he had been at Mr. Richards' residence the morning of the shooting helping Mr. Richards change a tire on his truck. He said that he drove a white Honda Accord, which was registered to his mother, and that he arrived at the residence between 12:30 and 1:00 a.m. Defendant explained that, after changing the tire, he and Mr. Richards went inside the residence. Defendant told Major Hembree that Mr. Richards and Ms. Maynard had stopped by his home around 10:00 p.m. on October 6 and that Mr. Richards had asked him to come to Mr. Richards' residence to help change a tire. He said that Mr. Richards and Ms. Maynard were at his home for about thirty minutes. Defendant said that he had a pistol belonging to his father sitting on his stove and that Ms. Maynard stole the pistol from his home without his knowledge. He said that, as soon as he walked in the front door into the living room of Mr. Richards' residence later that evening, Ms. Maynard pointed the gun at him and said that she wanted money. He said that Ms. Maynard was standing by the front door, facing him. Defendant recalled that he told her "no," thinking that she was joking. According to Defendant, Ms. Maynard said, "I've got your gun, I'm going to shoot your ass with it." Defendant told Major Hembree that Ms. Maynard and Mr. Richards knew that he had just been paid $500 for cleaning out the Triple-W arena and that he had the money "on him." He stated that Mr. Richards helped him clean the arena and that Mr. Richards was paid the same day as Defendant.

He said that, when Ms. Maynard demanded money, Mr. Richards started hitting him in the head with "something hard[.]" Defendant said that he had several "knots" on his head from where Mr. Richards hit him. Defendant stated, "I was scared, and I was trying to knock [the gun] . . . away from [Ms. Maynard], or get it away from me, because . . . she [was] pointing it at me." Defendant told Major Hembree that he wrestled with Ms. Maynard for control of the gun near the front door and that the gun "started going off[.]" He said that he was holding Ms. Maynard's arms, trying to keep her from pointing the gun at him. He said that Ms. Maynard "kept pointing it, and kept pulling the trigger[.]" Defendant denied that he pulled the trigger. He stated that Mr. Richards stopped hitting him, and he later realized Mr. Richards had been shot when he saw Mr. Richards slumped on the couch with blood on his head. He said that Mr. Richards did not say anything and that he believed Mr. Richards was dead. He explained that he did not know if Ms. Maynard had been shot.

Defendant told Major Hembree, "And then [Ms. Maynard] goes and gets in the truck and tries to leave, and all this, and still pointing the gun at me, and I'm trying to stop her from leaving." He stated:

>She tries to run out the door, you know, and gets in the truck. And I'm trying to stop her from leaving, you know. And she still had the gun, still pulling the trigger and stuff, and I tried to stop her in the truck. I -- I finally got the key out of the ignition on the truck, and then the next thing I know, she jumps out of the -- or fell out, and gets in my car.

Defendant recalled that Ms. Maynard was pointing the gun at him and pulling the trigger as she went to Mr. Richards' truck. He said that, although she was pulling the trigger, the gun did not fire. He stated that she hit him with the gun while they were inside the truck. When asked why he attempted to stop Ms. Maynard from leaving in the truck, Defendant replied:

>I didn't know what to do, sir, just to be honest. I didn't know how to act. You know, I know she had blood on her. I didn't want her to just leave. I didn't know how to act. You know what I mean? I didn't know what to do. But that's the first time I've ever been around something like that, sir.

Defendant said that because Ms. Maynard took his vehicle, he went back inside Mr. Richards' residence, dumped Ms. Maynard's purse on a bed to find her car keys, and then took her car to leave the scene. Defendant stated that he went to Cane Hollow, where he "was just throwing up, sick, crying[.]" He said that he parked Ms. Maynard's car in the woods, left the key in the ignition, and "just walked away." Defendant denied throwing anything out of Ms. Maynard's car. He recalled that Mr. Allen called him around 7:30 a.m. and told him that he was on the news and that one person was dead and the other in the hospital with a gunshot wound. He stated that Mr. Allen picked him up and brought him in to meet Deputy McDaniel. He said that his clothes were wet from walking through the woods.

Defendant told Major Hembree that the gun, which held six bullets, had been loaded when it was at his home. Defendant explained that he had the gun out shooting on Sunday and that he had reloaded it and left it on the stove. Defendant denied throwing Ms. Maynard's driver's license out of her car; he denied throwing anything out of the car. Defendant said he knew that Mr. Richards and Ms. Maynard sold methamphetamine and that Mr. Richards sold some to him previously.

Major Hembree photographed Defendant's head, hands, and legs. Defendant said that, to his knowledge, the only weapons involved in assault were his gun and the item Mr. Richards used to hit him. Defendant again denied shooting Mr. Richards and Ms. Maynard. He said that they did not get his money, which was in his wallet. Defendant stated that he was unsure what time Ms. Maynard pulled the gun on him; he said it could have been about 2:00 a.m. or that it could have been closer to 5:00 a.m. Defendant told Major Hembree that he did not know the location of his cell phone, stating: "It could be in the car, it could be right there in the woods, or what. I don't know." Regarding why he attempted to stop Ms. Maynard from leaving the scene, Defendant explained, "Well, I was trying to keep her there. I didn't know nothing was wrong with her. You know what I mean? I didn't know [Mr. Richards] was like he was in there. I was trying to keep her -- because I [saw] all that blood."

Major Hembree testified that, after another break in the interview, he served a search warrant on Defendant for "bodily fluids [and] the gunshot residue[.]" Major Hembree explained that he spoke to Defendant again on October 8. Before questioning Defendant, Major Hembree again advised Defendant of his *Miranda* rights, and Defendant executed a waiver of his rights. When confronted with the autopsy report that stated Mr. Richards was shot at a downward angle, Defendant said that he did not remember everything that happened. Defendant denied Ms. Maynard's version of events but admitted that he hit Ms. Maynard, "probably in the face, in the arms, in the chest, trying to get her away from me, trying to get the gun away[.]" He denied leaving Triple-W with Mr. Richards on the night of October 6; he said that he left with Mr. Allen.

Major Hembree testified that, pursuant to a search warrant, he collected a buccal swab from Defendant for DNA testing and swabbed Defendant's hands for gunshot residue. Major Hembree explained that those swabs were later sent to the TBI crime lab for testing. He recalled that a cell phone belonging to Mr. Richards was collected from the crime scene. He said that a detective with the Cookeville Police Department examined Mr. Richards' cell phone and retrieved the contents at his request. Major Hembree stated that the phone contained a record of calls and text messages between Mr. Richards and Defendant. He said that the log of text messages from the cell phone indicated that Defendant sent Mr. Richards a text message on September 23, 2015, which stated, "A D to 40"; the response back from Mr. Richards stated, "K." Major Hembree explained that he recognized the messages as a reference to a purchase of drugs. He said that there was an additional text message from Defendant to Mr. Richards on September 25, which stated, "Hey, I need some more. You up?" Major Hembree explained that other text messages between them showed that they were arranging to meet because Defendant wanted to purchase drugs from Mr. Richards.

Major Hembree said that the first communication between Mr. Richards and Defendant on October 6, 2015, occurred at 8:28 p.m. with Defendant calling Mr. Richards. There were two additional phone calls between Defendant and Mr. Richards that evening at 8:54 and 9:07 p.m. Defendant then sent Mr. Richards a text message at 10:23 p.m. asking if Mr. Richards was home.

On cross-examination, Major Hembree agreed that he took photographs of "some abrasions" on Defendant's head. He said that he did not observe any injuries to Defendant's face and that, although he photographed Defendant's hands and legs, he did not see any significant injuries there.

During a jury-out hearing, defense counsel explained that he wanted to cross-examine Major Hembree about policies of the sheriff's department found in its Use of Force and Critical Incident General Orders, but the State objected based on Rule 403. As part of an offer of proof, Major Hembree testified that, pursuant to the Use of Force General Order, if a deputy used force, the sheriff's department was to immediately contact the Tennessee Public Safety Network and have a critical incident stress debriefing team respond. Major Hembree stated, however, that supervisors talk to deputies who are involved in the use of force to obtain information about the incident. Regarding the Critical Incident General Order, Major Hembree testified that information obtained by the critical incident team was confidential and not used against a deputy involved in the use of force. Major Hembree explained that the procedures utilized after a use of force were "done to minimize the chances that an involved employee will develop or suffer from post-traumatic stress disorder" and that the general orders applied to employees of the sheriff's department, not to suspects of a crime.

Based on Major Hembree's testimony and its review of the Use of Force and Critical Incident General Orders, the trial court determined that the testimony from Major Hembree about the general orders was not relevant and sustained the State's objection. The court stated:

> It's clear to this Court . . . that these policies exist to deal with issues and provide support for employees, specifically debriefing them in dealing with emotional stress that occurs because of an incident such as this or one after. But the question's been asked of [Major Hembree] about what this intent for the policy is, and there's been no testimony here that the intent is because there's some unreliability, or the intent is to keep the officers from making statements to law enforcement. Quite the contrary.

Special Agent James Russell Davis, II, a forensic scientist with the TBI crime lab, testified that he processed the gunshot residue kit collected from Defendant. Agent Davis

testified that his examination did not reveal the presence of particles of gunshot primer residue. He explained that "[t]he absence of gunshot primer residue is consistent with an individual not having fired a weapon or being exposed to a source of gunshot primer residue." Agent Davis said that a negative result could also occur "when gunshot primer residue particles are lost due to washing, an excessive time interval between fire and discharge and collection, or other routine activities." In addition to the swabs taken from Defendant's hands, Agent Davis tested Defendant's clothing for gunshot residue. He said that the clothing did not reveal the presence of particles of gunshot primer residue.

Special Agent Laura Hodge, a forensic scientist with the TBI crime lab, testified that she tested Defendant's gun, a Bryko Model 38, .380 auto-caliber pistol. She determined that the bullet removed from Mr. Richards' body during autopsy shared the same class characteristics and some individual characteristics and could have been fired from Defendant's gun. She stated, however, that the results were not conclusive to the exclusion of all other firearms. Agent Hodge testified that she also examined three cartridge cases and one unfired round collected from the crime scene and found that the fired cartridge cases bore "the same size, shape, and contour firing print pin impression and breech face marks as the test-fired cartridge cases from the pistol." She stated, however, that the similarities were insufficient for a more conclusive examination. She explained that the insufficient results were due to the quality of the gun, stating that it was a "cheap gun."

Special Agent Mark Dunlap, a forensic scientist with the TBI crime lab, testified that he collected swabs from Defendant's white 2002 Honda Accord, which was sent to the TBI for processing. Agent Dunlap found blood on the inside and outside of the car in multiple places. Agent Dunlap tested the swab from the steering wheel and found that it contained a mixture of blood with Ms. Maynard as the major contributor and Mr. Richards excluded as the minor contributor. Agent Dunlap stated that the results were inconclusive as to Defendant due to the "limited minor profile." He said that he also found Ms. Maynard's blood on the driver's door, the rear windshield, the rear passenger door, and the front passenger door.

Agent Dunlap explained that the swabs submitted from the front door of Mr. Richards' residence contained a DNA profile that matched Ms. Maynard's. When he tested the swabs collected from the steering wheel of Mr. Richards' truck, Agent Dunlap found Ms. Maynard's blood. Agent Dunlap testified that the swab of the gun was tested and was found to contain Ms. Maynard's blood as well.

Agent Dunlap stated that he tested Defendant's clothing and found a mixture of Defendant's and Ms. Maynard's blood on Defendant's shirt. Agent Dunlap testified that he also tested the yellow rubber gloves. Agent Dunlap testified that the glove found in

the kitchen trash can in Mr. Richards' residence did not have blood on it but contained Defendant's DNA on the inside of the glove. Agent Dunlap explained that the yellow rubber glove found on the roadway tested positive for the presence of blood and that DNA testing established that the blood belonged to Ms. Maynard. He said that the swab from the inside of that glove was inconclusive due to a limited DNA profile obtained from the swab.

Defense Proof

Sergeant David Dillon of the Putnam County Sheriff's Department testified that he responded to Mr. Richards' residence on the morning of the shooting. He said that, after the inside of the residence was cleared, two deputies escorted medical personnel down the driveway to the residence so that they could attend to Mr. Richards. Sergeant Dillon explained that, once they determined that there was no medical aid they could provide to Mr. Richards, Sergeant Dillon had them escorted out of the scene. He said that he was unsure whether the perpetrator was still in the wooded area surrounding the residence. Sergeant Dillon testified that he "kept hearing some movement in the woods[.]" He agreed that, when deputies arrived, Mr. Richards' dog ran out of the residence and that the movement he heard could have been the dog.

Deputy Matthew Scott testified that, when he arrived at Mr. Richards' residence on the morning of the shooting, the front door was open. He approached the residence and saw Mr. Richards, who appeared to be deceased, on the living room couch. Deputy Scott recalled that a dog ran out of the residence and into the woods. He stated that, after clearing the inside of the residence, he heard movement in the woods. He agreed that deputies were unsure whether the movement was due to the dog or a possible suspect in the woods. As such, deputies set up a perimeter around the residence and called in additional deputies.

Deputy Troy Womack testified that he also responded to Mr. Richards' residence and that he helped set up a perimeter around the residence while deputies waited for detectives to arrive on the scene. He recalled that, at one point, deputies heard "movement" in the woods but that it was "later determined . . . it was a dog running around." He explained that the area was searched and "the dog was the only thing that made the noise that we found."

Mr. Burton testified that, on October 7, 2015, he lived next door to Mr. Richards on White Oak Flat Road. Mr. Burton recalled that, around 4:00 a.m., his wife woke him, saying "somebody's outside hollering for help." Mr. Burton stated that he opened his front door to see Ms. Maynard, who had "blood everywhere." Mr. Burton told his wife to call 9-1-1, and he brought Ms. Maynard inside the house. Mr. Burton asked Ms.

Maynard, "What's going on?" Ms. Maynard said that she and Mr. Richards had been shot. Mr. Burton testified that, when he asked Ms. Maynard who shot her, she replied, "They shot us." When questioned further by Mr. Burton, Ms. Maynard stated that "Jonesy" shot them. Mr. Burton testified that he then saw Ms. Maynard's car "drive by" his house after he invited her inside.

Mr. Burton recalled that, after Ms. Maynard was taken to the hospital, detectives did not allow him to clean up until "they had done an investigation in the house[.]" Mr. Burton stated that, when they were allowed to clean up, his wife picked up a bloody towel and a gun fell out of it. Mr. Burton called the detective back into the house. He said that the detective photographed the gun and collected it.

On cross-examination, Mr. Burton agreed that it was mainly his wife who spoke to Ms. Maynard. He testified, "I was watching, going to the door backwards and forwards watching, making sure there wasn't nobody coming back. Because when that car went by, I figured they was looking for her." Mr. Burton described Ms. Maynard as being "out of it" and stated that he believed she was going to die inside his house. He agreed that she had been shot in the mouth, that he could not hear well, and that it was hard to understand her. He further agreed that he did not report to detectives that Ms. Maynard used the word "they" or otherwise indicated there was more than one perpetrator.

Following deliberations, the jury found Defendant guilty of the lesser-included offenses of second degree murder and attempted second degree murder.

*Sentencing*

At a subsequent hearing, the trial court sentenced Defendant, as a Range I standard offender, to twenty-five years for second degree murder and to twelve years for attempted second degree murder and ordered the sentences to run consecutively, for a total effective sentence of thirty-seven years' incarceration. In imposing consecutive sentencing, the trial court found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The trial court then considered the *Wilkerson* factors, first finding that "[t]he circumstances surrounding the commission of the offense [were] aggravated." The trial court noted that, when Defendant shot Mr. Richards, Mr. Richards was unarmed, sitting on his couch, and not even looking at Defendant. The court stated, "[I]mmediately after the shooting of Mr. Richards . . . [D]efendant makes a choice to then turn and attempt to take the life of the only other individual, the only other, some may say, eyewitness." The trial court noted that Ms. Maynard struggled for her life as Defendant shot her multiple times and then attempted to prevent her from fleeing by repeatedly stabbing and hitting her.

- 23 -

Additionally, the trial court found that confinement for an extended period of time was necessary to protect society from Defendant and that the aggregate length of the sentence reasonably related to the offenses for which Defendant was convicted. The trial court stated that Defendant had demonstrated criminal and antisocial behavior throughout his life. The trial court further stated:

> . . . But I think the facts and circumstances surrounding this case, which is certainly something that I can consider, attempted second, killing of an eyewitness, you get it for free? I mean, what, what is that message? You get it for free? The behavior of [D]efendant during the commission of this offense, the attempt to extinguish two lives -- well, the attempt to extinguish one, and the extinguishing of one, Mr. Richards, those two things, and the proof that was entered, gives this Court belief that this sentence consecutive would reasonably relate to the offense[s] where [D]efendant stands convicted.

Following sentencing, Defendant filed a timely motion for new trial and an amended motion for new trial, which the trial court denied in a written order. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant argues that the State failed to produce sufficient evidence to support his convictions for second degree murder and attempted second degree murder "because the jury could not have taken Ms. Maynard's testimony as true and returned a guilty verdict on the lesser crime, which was wholly inconsistent with her testimony." He contends that, based on the jury's verdict, it rejected Ms. Maynard's testimony, "leaving the [S]tate without sufficient proof to convict [Defendant] of second-degree murder." Defendant asserts that, without Ms. Maynard's "implausible testimony," the State's proof did not establish that he knowingly killed Mr. Richards and attempted to knowingly kill Ms. Maynard. He argues that the State relied heavily on Defendant's interview and his absence from the crime scene but that "not being present at the scene and a few inconsistencies cannot be the sole basis for a murder conviction." The State responds that the evidence is more than sufficient to support Defendant's convictions. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

- 24 -

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2015). Second degree murder is a "result of conduct" offense. *See State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2015); *see Brown*, 311 S.W.3d at 431. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2015).

When viewed in the light most favorable to the State, the evidence supports Defendant's convictions for second degree murder and attempted second degree murder. Ms. Maynard testified that Defendant came over to Mr. Richards' residence to help Mr. Richards change a tire on his truck. She stated that she did not hear any conflict between Defendant and Mr. Richards. After going to bed, Ms. Maynard heard a vehicle traveling down the gravel driveway, and Mr. Richards opened the door to find Defendant. Ms. Maynard said that Defendant did not say anything at this time. Ms. Maynard stated that she was getting a glass of water in the kitchen when she heard a loud noise. Ms. Maynard saw Defendant with a gun and saw Mr. Richards grab his chest. She stated she then got into a physical altercation with Defendant and that Defendant shot Ms. Maynard in the face and in the knee. Ms. Maynard testified that she ran outside to try to drive

- 25 -

away in Mr. Richards' vehicle. Defendant, however, got into the vehicle and began hitting Ms. Maynard in the face with the gun, which knocked out some of her teeth. As Defendant was attempting to take the keys out of the ignition, Defendant left the gun on his lap. Ms. Maynard said that she grabbed the gun and tried to shoot Defendant, but the gun did not fire. Ms. Maynard also testified Defendant stabbed her in the back multiple times after they both exited Mr. Richards' vehicle. Ms. Maynard said that she eventually got into Defendant's vehicle and drove to a neighbor's residence for help. The jury accredited Ms. Maynard's testimony, and we will not reweigh this evidence. *See Bland*, 958 S.W.2d at 659.

The physical evidence also supports Defendant's convictions. Defendant's shirt was stained with Ms. Maynard's and Defendant's blood. The rubber glove found in Mr. Richards' kitchen trash can contained Defendant's DNA on the inside of the glove. The other rubber glove found on the street contained blood from Ms. Maynard. Blood found by Mr. Richards' front door matched Ms. Maynard's DNA profile. In addition, Ms. Maynard's blood was found on the steering wheel of Mr. Richards' truck, in several locations on Defendant's vehicle, and on the gun. Defendant did not have any significant injuries, unlike Ms. Maynard who sustained multiple injuries, including broken teeth, two gunshot wounds, and stab wounds.

Defendant claims that, after the incident, he drove to the remote area of Cane Hollow in Ms. Maynard's vehicle, left the vehicle in the woods, and "just walked away." Defendant argues his leaving the scene and disposing of Ms. Maynard's vehicle do not prove Defendant knowingly killed Mr. Richards and attempted to kill Ms. Maynard. Defendant argues these facts and Defendant's interview "cannot be the sole basis for a murder conviction." As noted above, however, these facts were not the sole basis for Defendant's convictions.

Defendant further contends that, because the jury did not convict Defendant of first degree murder based on Ms. Maynard's testimony, then Ms. Maynard's testimony should not be sufficient to convict Defendant of second degree murder and attempted second degree murder. However, the jury was free to reject premeditation and instead find that Defendant knowingly killed and attempted to kill the victims. As such, Defendant has failed to prove the evidence was insufficient to support his convictions. Therefore, Defendant is not entitled to relief on this issue.

*B. Trial Court's Reference to Ms. Maynard and Mr. Richards as "Victims"*

Defendant contends that he is entitled to a new trial because the trial court violated his right to due process by repeatedly referring to Ms. Maynard and Mr. Richards as "victims" throughout the trial and when charging the jury, "even though there were

competing versions of events where she was the aggressor and an instruction given to the jury as to [Defendant's] self-defense." Defendant's brief and reply brief fail to cite a single time to the transcript where the trial court used "victim" rather than "alleged victim." In his Motion in Limine #5, Defendant specifically requested that the trial court enter an order precluding the use of the term "victim" and instead requiring "all counsel and relevant persons to use the complaining witness['] proper name, or any of the following terms: 'Complaining Witness' or '*Alleged Victim*.'" (emphasis added). The trial court granted Defendant's motion, stating, "I agree with the defense, in . . . my jury instructions, of course, when I refer to the victim will be "alleged victim," and that is, I understand that to be the law. And I will, I'm going to ask the district attorney's office to refer to 'alleged victim.'"

Now on appeal, Defendant asserts duplicitously that, "[r]ather than simply use Mr. Richards' name or Ms. Maynard's name, the trial court glossed over this most necessary constitutional protection with an instruction early on in the trial" and merely instructed jurors that they should "'insert the word alleged' themselves if the term victim was inadvertently used." He argues that, by "[r]epeatedly referring to Mr. Richards and Ms. Maynard as victims, alleged or not, [the trial court] told the jurors . . . who was innocent, and who was guilty[,]" thereby undermining his fundamental right to the presumption of innocence. The State responds that Defendant has waived our consideration of the issue and that, waiver notwithstanding, the trial court did not err by referring to Ms. Maynard and Mr. Richards as "alleged victims."

We agree with the State that by failing to object to the use of the term "alleged victim" and by specifically suggesting the use of the term, Defendant waived our consideration of this issue. Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); *State v. Frank Graham*, 2013 WL 2395321, at *17 (Tenn. Crim. App. May 31, 2013) ("[A] party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error.").

Even if Defendant had not waived the issue, he would not be entitled to relief on the merits. Defendant cites to *State v. Alvin Brewer and Patrick Boyland*, to support his argument that the trial court's reference to "alleged victim" was inappropriate. Nos. W2012-02281-CCA-R3-CD, W2012-02282-CCA-R3-CD, 2014 WL 1669807, at *14-15 (Tenn. Crim. App. Apr. 24, 2014), *perm. app. denied* (Tenn. Sep. 18, 2014). However, the court in *Alvin Brewer* specifically found that the term "alleged victim" was not improper, and Defendant acknowledges that the trial court only used the term "alleged victim." *Id.* at *15. As such, this issue is without merit.

Defendant also raised for the first time in his reply brief a claim that the State used the term victim in its "initial closing argument thirteen times." "A reply brief is limited in scope to a rebuttal of the argument advanced in the appellee's brief." *Caruthers v. State*, 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991). Here, the State responded in its brief to Defendant's claim in its brief that the *trial court* used the term "victim." Defendant "cannot abandon an argument advanced in his brief and advance a new argument to support an issue in the reply brief." *Id.* The claim in the reply brief is waived.

## C. Cross-examination of Major Hembree

Defendant next challenges the trial court's ruling preventing him from impeaching Major Hembree with the Use of Force and Critical Incident General Orders. Defendant argues that, by depriving Defendant of the opportunity to cross-examine Major Hembree on this issue, the trial court abused its discretion and violated Defendant's right to due process. The State responds that the trial court did not abuse its discretion by prohibiting Defendant from questioning Major Hembree about the Use of Force and Critical Incident General Orders as they were not relevant. We agree with the State.

"The United States Supreme Court has said that 'the rights to confront and cross examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process,' and emphasized that the denial or 'significant diminution' of these rights 'calls into question the ultimate integrity of the fact finding process and requires that the competing interest be closely examined.'" *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295-96 (1973)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948); *Davis v. State*, 212 S.W.2d 374, 375 (Tenn. 1948)). A defendant's right to confront witnesses does not preclude a trial court from imposing limits upon the cross-examination of witnesses, taking into account such factors as "harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). Neither does a defendant's right to confront and cross-examine witnesses "mean that a defendant has a right to present irrelevant evidence." *Sheline*, 955 S.W.2d at 47. Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (Tenn. 1964)).

Upon review, we agree with the trial court that Defendant failed to show the relevance of Major Hembree's proffered testimony about the Use of Force and Critical Incident General Orders. Major Hembree's testimony about the general orders did not have "any tendency to make the existence of any fact that [was] of consequence to the determination of the action more probable or less probable than it would be without the evidence," Tenn. R. Evid. 401, and Defendant's right to cross-examine witnesses does not include the right to present irrelevant evidence. *Sheline*, 955 S.W.2d at 47. Accordingly, we see no clear abuse of discretion resulting in a manifest injustice to Defendant based on the trial court's limiting of Defendant's cross-examination of Major Hembree about the sheriff's department's general orders. Defendant is not entitled to relief.

## D. Improper Prosecutorial Argument

Defendant next contends that he is entitled to a new trial based on improper prosecutorial argument. Defendant contends that, during closing arguments, prosecutors improperly commented on the evidence, misstated the burden of proof, and provided analogies and anecdotes calculated to inflame the jury. He asserts that prosecutors "continuously comment[ed] on the evidence and credibility during closing arguments, even declaring the title to the [S]tate's closing, 'The Defendant's Story.'" He argues that the prosecutors used closing arguments to "weigh in on credibility of witness testimony" to the prejudice of Defendant and that the prosecutors' repeated references to "why [D]efendant would not tell a true story" were "thinly veiled attempts at calling [D]efendant's statements a lie in front of the jury[.]" The State responds that Defendant has waived the claim of improper prosecutorial argument and that he is not otherwise entitled to plain error relief. We agree with the State.

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008).

In *State v. Goltz*, this court listed five general areas of improper prosecutorial argument during closing:

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper argument of a prosecutor affected the verdict to the prejudice of the defendant:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

We first note that Defendant made no contemporaneous objections to the prosecutor's arguments that he now asserts were improper. Consequently, Defendant has waived this issue. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes waiver of the issue on appeal.") Defendant appears to assert that his "Motion in Limine Concerning the State's Argument," in which he sought an order generally prohibiting the State from engaging in improper prosecutorial argument or conduct, was sufficient to preserve this issue for plenary review. We disagree. The requirement of a contemporaneous objection allows the trial court to immediately address any improper argument and provide the jury with a curative instruction if appropriate. Moreover, a contemporaneous objection sustained by the trial court stops the prosecutor from continuing a line of argument deemed improper by the court. By failing to raise a contemporaneous objection, Defendant allowed the

alleged improper argument to continue, to the prejudice of Defendant.  Accordingly, this issue is waived.

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b).  Such issues are reviewed under plain error analysis.  *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).  Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994).  In order to be granted relief under plain error, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice."  *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief).  When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors.  *Smith*, 24 S.W.3d at 283.  The defendant bears the burden of persuasion to show that he is entitled to plain error relief.  *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

In this case, Defendant has not established that he is entitled to plain error relief, as no clear and unequivocal rule of law was breached.  Defendant contends that the prosecutor improperly commented on Defendant's credibility.  However, our review of the prosecutor's entire closing argument shows that the prosecutor argued that the physical evidence contradicted Defendant's claims.  The prosecutor did not inject his personal beliefs regarding Defendant's credibility.  The prosecutor was entitled to review the evidence and explain how it conflicted with Defendant's statement to investigators. *See State v. Jody Sweat*, No. E2000-02472-CCA-R3-CD, 2001 WL 1134604, at *9 (Tenn. Crim. App. Sept. 26, 2001) (explaining that "[t]he [S]tate has every right to question the veracity of the defendant's claims so long as it is in conjunction with evidence appearing in the record and the reasonable inferences which might be drawn therefrom"), *no perm. app. filed*; *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996) (noting that while it is unprofessional for counsel to express a personal belief or opinion in the truth or falsity of any testimony, "[a] prosecutor must be given leeway to argue reasonable inferences from the evidence.  Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying").

Defendant additionally asserts that the prosecutor improperly referred to the "mass killing in Las Vegas" as an anecdote to inflame the jury.  The prosecutor made the remark while acknowledging that it had not established Defendant's motive and explaining that the State was not required to prove motive.  The comment was limited

and made in passing, and we are not persuaded that the statement was sufficient to establish that a clear and unequivocal rule of law was breached. *Adkisson*, 899 S.W.2d at 641.

Defendant also asserts that the prosecutor misstated the burden of proof when he said that, if Defendant was lying, he was guilty. However, any alleged error in the prosecutor's argument did not affect the jury's deliberations. The trial court properly charged the jury on the State's burden of proof and charged the jury that the arguments of counsel were not evidence, and the jury is presumed to have followed those instructions. *Banks*, 271 S.W.3d at 134. Moreover, "[t]here is no indication that the jury was unduly swayed from its duties as explained in the jury instructions." *State v. Derrick Dewayne Lyons*, No. M2014-00178-CCA-R3-CD, 2015 WL 475158, at *11 (Tenn. Crim. App. Feb. 4, 2015), *perm. app. denied* (Tenn. June 11, 2015). The jury acquitted Defendant on the charged offenses of first degree murder and attempted first degree murder and instead convicted him of the lesser-included offenses of second degree and attempted second degree murder. Defendant has not established that consideration of the alleged error is necessary to do substantial justice. *Adkisson*, 899 S.W.2d at 641.

Finally, Defendant contends that the prosecutor improperly implied "that somehow these facts [were] more criminal than others," when the prosecutor said that Defendant's crimes were "crimes against the State." The prosecutor made this statement while admitting that Ms. Maynard and Mr. Richards "were drug users and breaking the law" but arguing that, as in all cases, Defendant's crimes were not only against Ms. Maynard and Mr. Richards but "against the peace and dignity of the [S]tate[.]" We note that the jury had heard this language already when the indictment was read at the beginning of trial. Moreover, it appears from the context of the argument that the prosecutor's remark was an attempt to persuade the jury to not hold the victims' lifestyles against the State in considering the evidence. In any event, Defendant has not shown that a clear and unequivocal rule of law was breached. He is not entitled to plain error relief.

### E. Motion to Suppress Defendant's Statements

Defendant asserts that the trial court erred by not suppressing his statements to police because he was questioned after being up all night and while under the influence and because his request for counsel was not honored. The State first responds that Defendant waived consideration of his claim that the trial court should have suppressed his statements based on his request for an attorney because he did not raise the claim in the proceedings below. Regarding Defendant's claim that his statement was not voluntary, the State responds that the trial court properly denied the motion to suppress and admitted Defendant's statements.

First, we agree with the State that Defendant waived our consideration of the claim that the trial court should have suppressed his statements because Defendant's unequivocal request for counsel was not honored by investigators. In his motion to suppress, Defendant argued that there was no probable cause for Defendant's warrantless arrest and that Defendant was too intoxicated or high to knowingly waive his *Miranda* rights. Defendant did not allege that his request for counsel was not honored, and as such, the trial court did not rule on the issue when denying the motion. Consequently, the issue is waived on appeal. *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). Moreover, based on the circumstances of this case, plain error relief is not warranted. *Bledsoe*, 226 S.W.3d at 355.

We now turn to Defendant's claim that the trial court erred by not suppressing his statements because Defendant did not knowingly waive his *Miranda* rights where he was questioned after being up all night and while under the influence. To determine whether a defendant waived his rights voluntarily, knowingly, and intelligently, courts must look at the totality of the circumstances. *Echols*, 382 S.W.3d at 280. Relevant factors include:

> the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the *Miranda* rights were explained.

*Id.* at 280-81.

In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson v. United States*, 530 U.S. 428, 433-35 (2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *Smith*, 933 S.W.2d at 455 (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary[.]" *Brimmer*, 876 S.W.2d at 79. The voluntariness of a confession is a question of fact. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014) (citing *Walton*, 41 S.W.3d at 81; *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *Smith*, 933 S.W.2d at 455; *Self v. State*, 65 Tenn. 244, 253 (Tenn. 1873)).

The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Id.* at 305 (citing *State v. Stamper*, 863 S.W.2d 404, 405

(Tenn. 1993)). A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434).

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000)).

In denying Defendant's motion to suppress, the trial court found that Defendant was properly *Mirandized* and that Defendant was not so intoxicated or "high" at the time of his interview that his statements were involuntary. The trial court accredited Major Hembree's testimony and found that Defendant was responsive to questioning, that his answers were coherent and appropriate to the questions asked, and that he corrected Major Hembree at different points in the interview when Major Hembree said something incorrect. The trial court further found that Major Hembree saw no clues to indicate that Defendant was under the influence of drugs or an intoxicant at the time of the interview.

We agree with the trial court's determination that Defendant's statements were voluntary under the totality of the circumstances. Prior to questioning Defendant, Major Hembree provided Defendant with a *Miranda* warning, and Defendant signed a written waiver of his *Miranda* rights. Although Defendant claims that he was under the influence and had not slept, he was responsive, articulate, and alert during questioning, and he showed no signs of being high or intoxicated. Defendant was able to provide a narrative of the events at Mr. Richards' residence and assert that he acted in self-defense. *See State v. Greene*, 613 S.W.2d 229, 232-33 (Tenn. Crim. App. 1980) (noting the "general rule . . . that a confession is admissible even though it was made at a time when the accused was under the influence of narcotic drugs or alcohol, if at that time, the accused was capable of making a narrative of past events or of stating his own participation in the crime"). Under these circumstances, we conclude that the trial court properly found that Defendant's statements to investigators were voluntarily given and denied Defendant's motion to suppress. Defendant is not entitled to relief.

*F. Consecutive Sentencing*

Defendant asserts that the trial court abused its discretion by ordering his sentences to be served consecutively. He contends that the trial court improperly concluded that he was a dangerous offender without relying on any facts outside of the two crimes the jury convicted him of committing. The State responds that the trial court properly imposed consecutive sentencing. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2018); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2018).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2018); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2018), Sentencing Comm'n Cmts.

The Tennessee Supreme Court has held that the *Bise* standard applies to consecutive sentencing determinations "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds" for discretionary consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). A trial court "may

order sentences to run consecutively" if it finds that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4) (2018); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). "The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings." *State v. Prentice C. Calloway*, No. M2004-01118-CCA-R3-CD, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005), *no perm. app. filed*.

Here, the trial court determined that Defendant was a dangerous offender under the discretionary consecutive sentencing grounds and provided reasons on the record to establish that ground. *See* Tenn. Code Ann. § 40-35-115(b)(4) (2018). Thus, we will review the trial court's decision to impose consecutive sentencing under an abuse of discretion standard with a presumption of reasonableness. *Pollard*, 432 S.W.3d at 861.

In determining whether to require Defendant to serve his sentences consecutively, the trial court properly considered the facts and evidence of the case and Defendant's criminal history. The trial court first determined that Defendant had little to no regard for the lives of Mr. Richards and Ms. Maynard. *See* Tenn. Code Ann. § 40-35-115(b)(4) (2018). The trial court noted that Defendant shot Mr. Richards while Mr. Richards was unarmed and seated on the couch. Moreover, the trial court noted the evidence showed that Mr. Richards was not facing Defendant when Defendant shot him. The trial court also stated that Defendant's attempt to kill Ms. Maynard immediately after killing Mr. Richards further exhibited Defendant's disregard for human life. The trial court did not credit Defendant's testimony regarding self-defense, finding that the scientific evidence of the case "did not support that theory." As a result, the trial court determined that Defendant was a dangerous offender under discretionary consecutive sentencing factor four. *See* Tenn. Code Ann. § 40-35-115(b)(4) (2018).

The trial court then proceeded to consider the *Wilkerson* factors. First, the trial court determined that an extended sentence was necessary to protect the public from further criminal conduct by Defendant. *Wilkerson*, 905 S.W.2d at 939. In supporting this decision, the trial court considered Defendant's criminal history and his most recent convictions in the present case. The trial court explained that Defendant's history of

possession and use of illegal narcotics, his prior convictions, and the facts of the present case, demonstrated Defendant's antisocial and criminal behavior. The trial court found that such behavior necessitated an extended sentence. Next, the trial court referred to "the facts and circumstances surrounding this case" to support its conclusion that Defendant's sentences reasonably related to the severity of his offenses. *Id.* The trial court referred to Defendant's behavior during the commission of extinguishing one life and attempting to extinguish another as supporting a conclusion that consecutive sentences reasonably related to Defendant's offenses. Therefore, we hold that the trial court did not abuse its discretion when it imposed consecutive sentencing.

Defendant argues that the trial court erred by only considering Defendant's two crimes of violence from the present case. However, as noted above, the trial court considered Defendant's crimes in the present case and his history of criminal convictions and behavior. Further, the trial court supported its conclusions and did not merely recite the *Wilkerson* factors. *See Prentice C. Calloway*, 2005 WL 1307800, at *13. As such, Defendant did not meet his burden of establishing that the sentence was improper, and he is not entitled to relief on this issue. Tenn. Code Ann. § 40-35-401 (2018), Sentencing Comm'n Cmts.

### *G. Cumulative Error*

Finally, Defendant contends that cumulative error warrants this court's reversal of his convictions and a remand for a new trial "consistent with the fundamental protections afforded under the United States and Tennessee Constitutions." The State responds that Defendant has failed to show that he is entitled to relief based upon cumulative error. We agree with the State.

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. Based on our review, Defendant is not entitled to cumulative error relief.

### **III. Conclusion**

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE